RON BENDER (SBN 143364)
IRVING M. GROSS (SBN 53659)
GWENDOLEN D. LONG (CA admission pending)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  rb@lnbyb.com, img@lnbyb.com, gdl@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor
And Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## (SAN FERNANDO VALLEY DIVISION)

| | |
|---|---|
| In re:<br><br>KRYSTAL AIR, LLC,<br><br>         Debtor. | ) Case No. 1:10-bk-23983-GM<br>)<br>) Chapter 11<br>)<br>) **DEBTOR'S EMERGENCY MOTION FOR**<br>) **ENTRY OF AN ORDER AUTHORIZING**<br>) **DEBTOR TO USE CASH COLLATERAL**<br>) **ON AN INTERIM BASIS PENDING A**<br>) **FINAL HEARING; MEMORANDUM OF**<br>) **POINTS AND AUTHORITIES AND**<br>) **DECLARATION OF EDWARD P.**<br>) **GRECH IN SUPPORT THEREOF**<br>)<br>) Date:        November 10, 2010<br>) Time:        3:00 p.m.<br>) Place:       Courtroom "303"<br>)                  21041 Burbank Blvd.<br>)                  Woodland Hills, CA<br>) |

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2,

9075-1, and Section 363(c) of title 11 of the United States Code,

11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and

Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy

1

1    Procedure, Krystal Air, LLC (the "Debtor"), the Chapter 11 debtor

2    and debtor in possession in the above-captioned case, hereby

3    moves, on an emergency basis (the "Motion"), for an order (1)

4    authorizing the Debtor to use cash collateral on an interim basis

5    
6    pending a final hearing in accordance with the Debtor's post-

7    petition operating budget (the "Budget"), a copy of which is

8    attached as Exhibit "1" to the annexed Declaration of Edward

9    Grech (the "Grech Declaration") and provide adequate protection

10   therefore, (2) granting other related relief, and (3) scheduling

11   a final hearing.

12                              **BACKGROUND**

13       The Debtor commenced its bankruptcy case by filing a

14   voluntary petition under Chapter 11 of the Bankruptcy Code on

15   
16   November 3, 2010 (the "Petition Date"). The Debtor continues to

17   operate its business, manage its financial affairs and operate

18   its bankruptcy estate as a debtor in possession pursuant to

19   Sections 1107 and 1108 of the Bankruptcy Code.

20       The Debtor is a California limited liability company founded

21   in 1998 and headquartered in Brea, California. The Debtor

22   
23   provides luxury charter jet services to corporate executives,

24   entertainment personalities and other travelers seeking first-

25   class private transportation. The Debtor owns and operates a

26   Gulfstream G-IV, Registration No. N914EG (the "Aircraft"),

27   
28   

                                    2

1   capable of transporting up to thirteen passengers and offering

2   top-of-the-line amenities and conference space.

3       The home airport of the Aircraft is the Van Nuys Airport,

4   located in Los Angeles, County.  In order to provide consistent

5   service and avoid the excessive cost of contract pilots, the

6

7   Debtor employs a chief pilot and co-pilot on a salaried basis.

8       The Debtor is presently operating under a charter lease

9   agreement with Western Air Charter, Inc. ("Western Air"), whereby

10  the Aircraft operates under Western Air's operating certificate

11  in exchange for Western Air arranging chartered flights of the

12  Aircraft.  However, the Debtor has negotiated a lease agreement

13  (the "Lease Agreement") with Pegasus Elite Aviation, Inc. ("PEA")

14  that will become effective December 1, 2010.  The Lease Agreement

15

16  provides for a contract rate of $3,000 per flight hour and a

17  guaranty by PEA of fifty hours of charter revenue per month.  In

18  the event PEA does not meet this guaranteed minimum, PEA will pay

19  the Debtor $2,000 for each and every hour short of the guaranty.

20  Based on this guaranteed contract minimum and the Debtor's

21  historic monthly charter revenue, the Debtor anticipates a

22

23  monthly gross cash flow of at least $150,000 and up to $240,000.

24      In March, 2007, the Debtor purchased the Aircraft with

25  financing provided by General Electric Capital Corporation

26  (together with General Electric Capital Solutions, VFS Financing,

27  Inc., and any after acquiring lender, including PNC Bank, N.A.,

28

1   collectively, "Lender"). In connection with such financing, the

2   Debtor executed a promissory note in the face amount of

3   $14,300,000 (the "Note") and an Aircraft Security Agreement

4   granting the Lender a security interest in the Aircraft. The

5   Note requires the Debtor to pay, on a quarterly basis, all

6   accrued and outstanding interest plus $100,000 in principal

7   reduction through maturity on September 1, 2017. Upon maturity

8   the Note requires Debtor to pay a balloon payment of $10.4

9   million, plus all then outstanding and unpaid principal, accrued

10  interest and other miscellaneous amounts. Over the past year,

11  the Debtor's quarterly obligations under the loan were

12  approximately $316,000 per payment period.

13  The Debtor has the need to use the revenue generated by the

14  Debtor's use of the Aircraft to maintain the Aircraft and pay

15  operating expenses relating to the Aircraft, including, among

16  other things, insurance, utilities, payroll, maintenance and

17  other operational costs associated with the Aircraft. Without

18  the ability to use cash collateral to pay the ongoing operating

19  expenses of the Aircraft, the Debtor will not be able to

20  continue maintaining the Aircraft. This, in turn, would require

21  the Debtor to discontinue its normal operations, which would

22  decimate the going concern value of the Debtor's business and

23  damage its contractual charter relationships.

24  The Debtor's proposed operating budget (the "Budget"),

4

1    attached as Exhibit "1" to the Grech Declaration, contains the

2    expenses the Debtor believes must be paid in order for the

3    Debtor to continue to operate and preserve the value of its

4    business pending a successful reorganization. The Budget is

5
6    prepared on a weekly basis. The expenses contained in the first

7    few weeks of the Budget are those expenses the Debtor believes

8    must be paid to enable the Debtor to avoid immediate and

9    irreparable harm to the Debtor's business and bankruptcy estate.

10   The revenues projected in the Budget are the revenues the Debtor

11   projects receiving if business proceeds as planned.

12        The Debtor understands that the Lender contends that the

13   revenue generated by the Aircraft is the Lender's cash

14
     collateral. Pursuant to this Motion, the Debtor seeks Court

15
16   authority to use its cash collateral in order to pay the

17   expenses of maintaining and operating the Aircraft in accordance

18   with the Budget. In addition, the Debtor seeks authority to use

19   its cash collateral to pay all quarterly fees owing to the

20   Office of the United States Trustee and all expenses owing to

21   the Clerk of the Bankruptcy Court, as well as to pay the various

22
     miscellaneous costs of operating as a Debtor in Chapter 11 as
23
24   more described below.

25        Given that the value of the Aircraft remains steady and the

26   Debtor continues to generate revenue through the operation of

27   the Aircraft, the Debtor submits that the Lender is adequately

28

5

1  protected despite the Debtor's use of cash collateral.  As an

2  additional form of adequate protection, the Debtor proposes to

3  make post-petition interest payments to the Lender and provide

4  the Lender with replacement liens against the Debtor's post-

5
   petition assets with the same extent, validity, scope and
6
7  priority as the Lender's pre-petition lien against the Debtor's

8  pre-petition assets.  The Debtor's use of cash collateral is

9  critical to the Debtor's ability to formulate and implement an

10 effective reorganization strategy for the benefit of all

11 creditors.

12
       In addition to the Lender, there are a number of other
13
   creditors who have recorded various liens against the Aircraft
14
   with the Federal Aviation Administration.  The Debtor believes
15
16 that the total amount of the liens recorded against the

17 Property, as of the Petition Date, was approximately \$54,945.

18 Even if the foregoing liens are valid and enforceable (which the

19 Debtor does not concede), such liens against the Aircraft do not

20 result in a security interest against the Debtor's cash

21 collateral.

22
       Pursuant to Bankruptcy Rule 4001(b)(2), while the Court
23
24 cannot conduct a final hearing on this Motion earlier than 14

25 days after service of this Motion, the Court may conduct a

26 preliminary hearing before such 14-day period expires to enable

27 the Debtor to use cash collateral as is necessary to avoid

28

6

1  immediate and irreparable harm to the Debtor's estate pending a

2  final hearing. Such an expedited procedure is routine in

3  Chapter 11 as it is the rare Chapter 11 debtor that can survive

4  for 14 days or more without use of any funds.

5                    **ADDITIONAL INFORMATION**

6

7      Pursuant to Local Bankruptcy Rule 4001-2, the Debtor makes

8  the following statements regarding the relief requested in this

9  Motion for the use of cash collateral and approval of the

10 proposed interim order approving this Motion (the "Interim

11 Order") and any final order thereon:

12

| Provision | Description and Location |
|---|---|
| Cross-collateralization clauses | No. |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's lien or debt. | No. |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's lien and liens held by persons who are not party to the stipulation, or which create a lien senior or equal to any existing lien. | No. |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. | No. |
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No. |

7

| Provision | Description and Location |
|---|---|
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No. |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No. |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No - except for standard replacement lien language in the Interim Order. |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No. |
| Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent. | No. |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No. |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No. |
| Findings of fact on matters extraneous to the approval process. | No. |

The relief sought in this Motion is based upon this Motion, the annexed Memorandum of Points and Authorities and Grech Declaration in support of this Motion, and any exhibits thereto, the arguments and representations of counsel made at the hearing

8

1  on this Motion, and any other evidence properly presented to the

2  Court at or prior to the hearing on this Motion.

3     **WHEREFORE,** the Debtor respectfully requests that the Court

4  enter an order in substantially the form of the Interim Order

5  attached hereto as Exhibit "2" to the Grech Declaration and

6  order as follows:

7

8     1.   finding, among other things, that notice of this

9  Motion was appropriate under the circumstances and complied with

10  all applicable provisions of the Bankruptcy Code, the Bankruptcy

11  Rules, and the Local Bankruptcy Rules;

12     2.   granting this Motion on an interim basis pending a

13  final hearing;

14

15     3.   authorizing the Debtor, subject to the terms of the

16  Interim Order, to use cash collateral to pay all of the expenses

17  set forth in the Budget on an interim basis pending a final

18  hearing and as otherwise set forth below;

19     4.   providing the Lender with a replacement lien and

20  adequate protection payments as set forth in the Interim Order;

21     5.   setting a final hearing on this Motion; and

22

23

24  ///

25  ///

26  ///

27

28

9

1       6.    granting such other and further relief as the Court

2 deems just and proper.

3 Dated: November 5, 2010      KRYSTAL AIR, LLC

4

5                      By:   */s/ Ron Bender*

6                          RON BENDER
                         IRVING M. GROSS

7                          GWENDOLEN D. LONG
                         LEVENE, NEALE, BENDER, YOO

8                          & BRILL L.L.P.
                         Proposed Attorneys for

9                          Chapter 11 Debtor and Debtor
                         in Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.   STATEMENT OF FACTS**

3   **A.   BACKGROUND AND NECESSITY FOR FILING BANKRUPTCY.**

4        1.   The Debtor commenced its bankruptcy case by filing a
5   voluntary petition under Chapter 11 of the Bankruptcy Code on
6   November 3, 2010 (the "Petition Date").  The Debtor continues to
7   operate its business, manage its financial affairs and operate
8   its bankruptcy estate as a debtor in possession.

9        2.   The Debtor is a California limited liability company
10  founded in 1998 and headquartered in Brea, California.  The
11  Debtor provides luxury charter jet services to corporate
12  executives, entertainment personalities and other travelers
13  seeking first-class private transportation.  The Debtor owns and
14  operates a Gulfstream G-IV, Registration No. N914EG (the
15  "Aircraft"), capable of transporting up to thirteen passengers
16  and offers top-of-the-line amenities and conference space.

17       3.   The home airport of the Aircraft is the Van Nuys
18  Airport, located in Los Angeles County.  In order to provide
19  consistent service and avoid the excessive cost of contract
20  pilots, the Debtor employs a chief pilot and co-pilot on a
21  salaried basis.

22       4.   The Debtor is presently operating under a charter lease
23  agreement with Western Air Charter, Inc. ("Western Air"), whereby
24  the Aircraft operates under Western Air's operating certificate
25  in exchange for Western Air arranging chartered flights of the
26  Aircraft.  However, the Debtor has negotiated a one-year lease
27  agreement (the "Lease Agreement") with Pegasus Elite Aviation,
28  Inc. ("PEA") that will become effective December 1, 2010.  The

11

1  Lease Agreement provides for a contract rate of $3,000 per flight
2  hour and a guaranteed minimum use by PEA of fifty hours of
3  charter revenue per month.  In the event PEA fails to meet this
4  guaranteed minimum, PEA will pay the Debtor $2,000 for each and
5  every hour short of the guaranty.  Based on this guaranteed
6  contract minimum and the Debtor's historic monthly charter
7  revenue, the Debtor anticipates a monthly gross cash flow of at
8  least $150,000 and up to $240,000.

9          5.    In March, 2007, the Debtor purchased the Aircraft with
10  financing provided by General Electric Capital Corporation
11  (together with General Electric Capital Solutions, VFS Financing,
12  Inc., and any after acquiring lender, including PNC Bank, N.A.,
13  collectively, "Lender").  In connection with such financing, the
14  Debtor executed a promissory note in the face amount of
15  $14,300,000 (the "Note") and an Aircraft Security Agreement
16  granting the Lender a security interest in the Aircraft.  The
17  Note requires the Debtor to pay, on a quarterly basis, all
18  accrued and outstanding interest plus $100,000 in principal
19  reduction through maturity on September 1, 2017.  Upon maturity
20  the Note requires Debtor to pay a balloon payment of $10.4
21  million, plus all then outstanding and unpaid principal, accrued
22  interest and other miscellaneous amounts.  Over the past year,
23  the Debtor's quarterly obligations under the loan were
24  approximately $316,000 per payment period.

25          6.    In addition to the Lender, there are a number of other
26  creditors who have recorded various liens against the Aircraft
27  with the Federal Aviation Administration.  The Debtor believes
28  that the total amount of the liens recorded against the Property,

12

1  as of the Petition Date, was approximately $54,945.  Even if the
2  foregoing liens are valid and enforceable (which the Debtor does
3  not concede), such liens against the Aircraft do not result in a
4  security interest against the Debtor's cash collateral.

5       7.   In late 2009, the Debtor approached the Lender seeking
6  an accommodation and short-term modification of the Note.   The
7  Debtor initially offered a specific, eight-month plan that, if
8  accepted, would have reduced its quarterly interest payments from
9  approximately $216,000 ($72,000 per month) to $120,000 ($40,000
10  per month) and would have suspended two of the $100,000 principal
11  buy-down payments.

12      8.   The   Debtor   sought   this   accommodation,   before
13  encountering   actual   late-payments,   defaults   or   other
14  delinquencies under the Note.  Instead, the Debtor contacted the
15  Lender and sought to reach an accommodation to avoid any
16  delinquencies.   The recession had depressed the air charter
17  market, causing a significant reduction in charter usage and
18  reduction in the Debtor's revenues.

19      9.   The  accommodation  and  short-term  modification  the
20  Debtor proposed would have, if accepted, provided the time
21  necessary to complete two objectives that would have allowed it
22  to survive the recession.   The first was the conclusion of
23  negotiations it had previously begun with an existing client for
24  a long-term lease of the Aircraft.  Alternatively, the Debtor
25  sought the time necessary to permit its primary affiliate,
26  Krystal Koach, Inc., to complete a successful workout with its
27  secured lender.  The Debtor was confident that its proposal, a
28  variation of its proposal, or even an alternative manner of

13

1 │ workout would have provided the revenue and time necessary to
2 │ reach these goals.  The accommodation the Debtor sought would
3 │ have improved its overall financial condition and would have
4 │ allowed it, by the end of the modification period, to return to
5 │ the original loan terms.

6 │   10.  Between December 2009 and April 2010, the Debtor and
7 │ the Lender engaged in extensive negotiations that the Debtor
8 │ understood were cooperative, productive and done in good faith to
9 │ reach a commercially equitable, short-term accommodation.  This
10 │ accommodation, if reached, would have allowed the Debtor to
11 │ survive the historic recession.  Through this process the Debtor
12 │ modified the relief it sought and its proposals for such relief.
13 │ First, the Debtor restricted its request to seek only temporary
14 │ relief from the $100,000 quarterly, principal buy-down.  The
15 │ Debtor abandoned its prior request to reduce the interest payment
16 │ in addition to the principal reduction.  Second, it offered to
17 │ provide the Lender additional security for the duration of the
18 │ short-term modification. The Debtor offered a trust deed against
19 │ certain commercial real property as additional collateral.  Thus,
20 │ the Debtor offered the Lender a short-term, specific and secured
21 │ relief plan that would have allowed it to improve its overall
22 │ financial condition and to return to the original loan terms by
23 │ the end of the modification period.

24 │   11.  The Lender inspected the real estate the Debtor offered
25 │ as additional security.  Then, the Lender notified the Debtor, by
26 │ letter in January, 2010, of an alleged default.  The Lender's
27 │ letter based the Debtor's default on its alleged failure to make
28 │ its December 1, 2009 quarterly payment.  Yet, during its

14

1  negotiations, the Lender assured the Debtor it could and would
2  defer the Debtor's payments on the Note until the modification
3  was finalized.  Negotiations continued over the next three months
4  based on the Lender's assurances and based on the Lender's
5  inaction regarding the alleged default.

6      12.  On April 12, 2010, the Lender's counsel sent a letter
7  to the Debtor declaring the Debtor to be in default and
8  purporting to accelerate the Debtor's obligations under the Note
9  (the "Demand Letter").  Immediately upon receipt of the Demand
10  Letter, the Debtor contacted the Lender to resolve this apparent
11  misunderstanding. On April 19, 2010, the parties conferred and
12  the Debtor agreed to bring the entire account current.  Based on
13  these specific discussions, not to mention the prior six months
14  of negotiations, the Debtor understood quite clearly that the
15  Lender intended to completely waive all defaults when the Debtor
16  brought the account current.

17      13.  The Debtor understood the Lender was agreeable to its
18  April 19th proposal, but the Lender did not thereafter respond,
19  except to continue the negotiations for a modification.  The
20  Debtor and the Lender exchanged another round of written
21  proposals in mid-May, 2010.

22      14.  By June, 2010, however, the tone of the negotiations
23  changed significantly.  The Lender had become intransigent and
24  refused to reinstate the Note.  The Lender now insisted on
25  modification terms that were so unreasonable that failure and the
26  Debtor's loss of its business were practically built-in.

27      15.  Based on its April 19 discussions, to show its good
28  faith and to re-start meaningful negotiations, the Debtor

15

1  delivered to the Lender a make-whole check in the amount needed
2  to bring the account current – including late charges – in the
3  amount of $947,400.31. The Lender, however, still refused to
4  honor the terms of the Note.

5      16.  On July 9, 2010, the Debtor retained LNBYB in a further
6  effort to attempt to negotiate a resolution of the dispute with
7  the Lender.  Those efforts too were ultimately unsuccessful.

8      17.  As a result of the foregoing, the Debtor was forced to
9  seek protection under Chapter 11 of the Bankruptcy Code in order
10 to continue operating the Aircraft in an effective and cost-
11 efficient manner, to preserve and maximize the value of the
12 Aircraft for the benefit of all creditors, and to confirm a plan
13 of reorganization and successfully emerge from bankruptcy.

14 **B.   THE DEBTOR'S IMMEDIATE NEED FOR USE OF CASH COLLATERAL.**

15     The Debtor has the need to use the revenue generated from
16 the Aircraft to maintain the Aircraft and pay operating expenses
17 relating to the Aircraft, including, among other things,
18 insurance, utilities, payroll, maintenance and other operational
19 costs associated with the Aircraft.  Without the ability to use
20 cash collateral to pay the ongoing operating expenses of the
21 Aircraft, the Debtor will not be able to continue maintaining
22 the Aircraft.  This, in turn, would require the Debtor to
23 discontinue its normal operations, which would decimate the
24 going concern value of the Debtor's business and damage its
25 contractual relationship with PEA.

26     The Debtor's proposed Budget contains the expenses the
27 Debtor believes must be paid in order for the Debtor to continue
28 to operate and preserve the value of its business pending a

1  successful reorganization. The Budget is prepared on a weekly
2  basis. The expenses contained in the first few weeks of the
3  Budget are those expenses the Debtor believes must be paid to
4  enable the Debtor to avoid immediate and irreparable harm to the
5  Debtor's business and bankruptcy estates. The revenues
6  projected in the Budget are the revenues the Debtor projects
7  receiving if business proceeds as planned.

8      In addition to the expenses set forth in the Budget, the
9  Debtor is also seeking Court authority to use cash collateral to
10 pay for the following: (a) all quarterly fees owing to the
11 Office of the United States Trustee and all expenses owing to
12 the Clerk of the Bankruptcy Court; and (b) all actual third-
13 party, outside expenses incurred by the Debtor (or its counsel)
14 directly related to the administration of the Debtor's
15 bankruptcy estate (for items such as photocopying, postage,
16 searches, etc.), not to exceed the total sum of $10,000 per
17 month. In addition, the Debtor seeks Court authority to deviate
18 from the line items contained in the Budget by not more than 15%
19 on a line item basis and not more than 10% on an aggregate
20 basis. Moreover, if any actual expenditures for any line items
21 during a particular period are less than in the Budget, the
22 Debtor seeks Court authority to have the difference carryover to
23 the following period covered by the Budget. The Debtor also
24 seeks Court authority to pay any other expenses related to the
25 operation of the Debtor's business which are not contained in
26 the Budget without the need for any further order of the Court
27 provided the Lender consent to those payments in advance and in
28 writing.

17

1  C.   **THE LENDER'S LOANS AND LIENS**.

2      As addressed above, prior to the Petition Date, the Debtor

3  entered into the Note and related security agreement with the

4  Lender.   The Lender asserts, and the Debtor disputes, that

5  payment under the Note has been accelerated.   The Debtor is

6  aware of other liens in the aggregate amount of approximately

7  $56,945 filed against the Aircraft.   However, even were such

8  liens to be valid, they would not result in a security interest

9  against the Debtor's cash or charter revenue.

10                      **II.   DISCUSSION**

11  **A.   THE DEBTOR MUST BE AUTHORIZED TO USE CASH COLLATERAL TO**

12      **OPERATE, MAINTAIN, AND PRESERVE ITS BUSINESS IN ACCORDANCE**

13      **WITH THE BUDGET.**

14      The Debtor's use of property of the estate is governed by

15  Section 363 of the Bankruptcy Code.   Section 363(c)(1) provides

16  in pertinent part:

17           If the business of the debtor is authorized

18           to be operated under section . . .1108. . .

19           of this title and unless the court orders

20           otherwise, the trustee may enter into

21           transactions, including the sale or lease of

22           property of the estate, in the ordinary

23           course of business, without notice or a

24           hearing, and may use property of the estate

25           in the ordinary course of business without

26           notice or a hearing.

27

28

1   11 U.S.C. §363(c)(1).  A debtor in possession has all of the

2   rights and powers of a trustee with respect to property of the

3   estate, including the right to use property of the estate in

4   compliance with Section 363.  See 11 U.S.C. §1107(a).

5        "Cash  collateral"  is  defined  as  "cash,  negotiable

6   instruments, documents of title, securities, deposit accounts or

7   other cash equivalents in which the estate and an entity other

8   than the estate have an interest. . . ."  11 U.S.C. §363(a).

9   Section 363(c)(2) allows the use of "cash collateral" under

10  subsection (c)(l) if:

11              (A)  each entity that has an interest in

12              such cash collateral consents; or

13              (B)  the court, after notice and a hearing,

14              authorizes  such  use,  sale  or  lease  in

15              accordance  with  the  provisions  of  this

16              section.

17  See 11 U. S.C. §363(c)(2)(A) and (B).

18       It is well settled that it is appropriate for a Chapter 11

19  debtor to use cash collateral for the purpose of maintaining and

20  operating its property.  11 U.S.C. § 363(c)(2)(B); In re Oak

21  Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981);  In re

22  Tucson Industrial Partners, 129 B.R. 614 (B.A.P. 9th Cir. 1991).

23  In addition, where the debtor is operating a business, it is

24  extremely important that the access to cash collateral be

25  allowed in order to facilitate the goal of reorganization: "the

26  purpose of Chapter 11 is to rehabilitate debtors and generally

27  access to cash collateral is necessary to operate a business."

28

19

1 | In re Dynaco Corporation, 162 B.R. 389 (Bankr. D.N.H. 1993),
2 | quoting In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

3 | The Lender will be adequately protected through replacement
4 | liens, ongoing post-petition interest payments in the amount of
5 | approximately $72,000 per month, and the continued operation of
6 | the Debtor's business which will maintain the going concern
7 | value of the Debtor's business. Moreover, the Debtor does not
8 | believe that the Aircraft is currently declining in value and
9 | certainly not by any appreciable amount during a short Chapter
10 | 11 bankruptcy case. Based on the foregoing, the Motion should
11 | be granted, and the Debtor should be authorized to use cash
12 | collateral pursuant to Section 363(c) of the Bankruptcy Code.

13 | In addition, the Debtor submits that there is good cause to
14 | grant the Motion and authorize the Debtor's use of cash
15 | collateral pursuant to Section 363(c)(2)(B) of the Bankruptcy
16 | Code. As discussed above, the only source of revenue available
17 | to the Debtor to use to operate, maintain, and preserve its
18 | business is the revenue generated from the operation of the
19 | Aircraft. Without the use of cash collateral, the Debtor would
20 | not be able to continue operating its charter business and would
21 | be forced to shut down, which would result in the loss of the
22 | jobs of the Debtor's employees and the complete decimation of
23 | the going concern value of the Debtor's business.

24 | **B.   THE LENDER AND ANY OTHER CREDITORS WITH AN INTEREST**

25 | **IN THE DEBTOR'S CASH COLLATERAL ARE ADEQUATELY PROTECTED.**

26 | To the extent that an entity has a valid security interest
27 | in the revenues generated by property, those revenues constitute
28 | "cash collateral" under Section 363(a) of the Bankruptcy Code.

20

1  Pursuant to Section 363(c)(2), the Court may authorize the
2  debtor to use a secured creditor's cash collateral if the
3  secured creditor is adequately protected.    In re Mellor, 734
4  F.2d 1396, 1400 (9th Cir. 1984); see also In re O'Connor, 808
5  F.2d 1393, 1398 (10th Cir. 1987); In re McCombs Properties VI,
6  Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

7      Adequate protection can come in a number of forms.   11
8  U.S.C. § 361.   Cases have held that the preservation of the
9  value of a secured creditor's lien is sufficient to provide
10 adequate protection to a secured creditor when a debtor seeks to
11 use cash collateral.    In re Triplett, 87 B.R. 25 (Bankr.
12 W.D.Tex. 1988).    See also In re Stein, 19 B.R. 458 (Bankr.
13 E.D.Pa. 1982).

14     As reflected in the Budget, the Debtor's continued
15 operation and maintenance of the Aircraft will adequately
16 protect the Lender (and any other secured creditors) as the
17 Debtor will continue to generate revenue and preserve the value
18 of the Aircraft.   Other courts have determined that a debtor's
19 continued business operations can constitute the adequate
20 protection of a secured creditor.    See Matter of Pursuit
21 Athletic Footwear, Inc., 193 B.R. 713 (Bankr. D. Del. 1996); In
22 re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450
23 (Bankr. D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr.
24 D.N.H. 1993); In re Immenhausen Corp., 164 B.R. 347, 352 (Bankr.
25 M.D. Fla. 1994).

26     Moreover, in determining adequate protection, courts have
27 stressed the importance of promoting a debtor's reorganization.
28 In O'Connor, the Tenth Circuit stated:

1

2

3

4

5

6

7

8

9

10

11

12

> In this case, Debtors, in the midst of a
> Chapter 11 proceeding, have proposed to deal
> with cash collateral for the purpose of
> enhancing the prospects of reorganization.
> This quest is the ultimate goal of Chapter
> 11. Hence, the Debtor's efforts are not
> only to be encouraged, but also their
> efforts during the administration of the
> proceeding are to be measured in light of
> that quest. Because the ultimate benefit to
> be achieved by a successful reorganization
> inures to all the creditors of the estate, a
> fair opportunity must be given to the
> Debtors to achieve that end. Thus, while
> interests of the secured creditor whose
> property rights are of concern to the court,
> the interests of all other creditors also
> have bearing upon the question of whether
> use of cash collateral shall be permitted
> during the early stages of administration.

13  O'Connor, 808 F.2d at 1937.

14      Pursuant to the Supreme Court case of United Savings

15  Association v. Timbers of Inwood Forest Associates, 108 S.Ct.

16  626, 629 (1988) ("Timbers"), and subsequent case law, the

17  property interest that a debtor must adequately protect pursuant

18  to Sections 361(1) and (2) of the Bankruptcy Code is only the

19  value of the lien that secures the creditor's claim. Timbers,

20  108 S.Ct. at 630. See also McCombs, 88 B.R. at 266. Section

21  506(a) "limit[s] the secured status of a creditor (i.e., the

22  secured creditor's claim) to the lesser of the [allowed amount

23  of the] claim or the value of the collateral." McCombs at 266.

24      The Debtor and the Lender agree that the current fair

25  market value of the Aircraft is less than the outstanding

26  indebtedness owing by the Debtor to the Lender under the Note.

27  The Lender is therefore undersecured and only entitled to

28  adequate protection of the secured portion of its claim, which,

22

1  pursuant to Section 506 of the Bankruptcy Code, is equal to the
2  fair market value of the Aircraft. Furthermore, absent a
3  showing by the Lender that the Aircraft is declining in value,
4  the Lender is not entitled to adequate protection. See Timbers,
5  108 S.Ct. at 630 (adequate protection required where "security
6  is depreciating during the term of the stay"). Therefore, to
7  the extent the Aircraft will maintain its value during the
8  Debtor's short stay in Chapter 11, which the Debtor contends it
9  will, the Lender is adequately protected. See In re Smithfield
10 Estates, Inc., 48 B.R. 910 (Bankr. D. R.I. 1985) ("adequate
11 protection relates to maintaining the status-quo during the
12 period after the filing of the petition and before confirmation
13 or rejection of the plan").

14      Notwithstanding, the Interim Order provides the Lender with
15 additional adequate protection in the form of standard
16 replacement liens and ongoing post-petition interest payments to
17 protect against any post-petition diminution in the value of the
18 Lender's collateral.

19      As the Debtor does not believe that any of the other
20 creditors purporting to hold a security interest in the Aircraft
21 has an interest in the Debtor's cash collateral, there is no
22 other interest for which to provide adequate protection
23 resulting from the Debtor's use of cash collateral.
24 Notwithstanding the foregoing, the Debtor submits that any
25 alleged interests of any other creditors besides the Lender in
26 the cash collateral will be adequately protected by the
27 continued operation of the Debtor's business and similar
28 replacement liens which have the same extent, validity, scope

23

1 and priority as such creditors' pre-petition lien against the
2 Debtor's pre-petition assets.

3    **C.   THE PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF THIS**
4        **MOTION HAVE BEEN SATISFIED.**

5     Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtor is
6 required to serve a copy of this Motion on any entity with an
7 alleged interest in the Debtor's cash collateral, any committee
8 appointed or on the twenty largest unsecured creditors if no
9 committee has been appointed, and any other entity that the
10 Court directs. The Debtor has complied with the foregoing by
11 serving a copy of this Motion upon the Office of the United
12 States Trustee, all alleged secured creditors and their counsel
13 (if known), the Debtor's 20 largest unsecured creditors, and
14 other parties in interest via email, telephone, facsimile,
15 and/or overnight mail (to the extent that contact information
16 was available). Moreover, the Debtor served a copy of this
17 Motion and all supportive papers by overnight mail upon the
18 aforementioned parties concurrently with the filing of such
19 papers with the Court. Such parties should receive delivery of
20 all pleadings by overnight mail on Monday, November 8, 2010.

21                                       **III.**

22                           **CONCLUSION**

23     BASED UPON ALL OF THE FOREGOING, the Debtor respectfully
24 requests that the Court enter an order in substantially the form
25 of the Interim Order attached hereto as Exhibit "2" to the Grech
26 Declaration and order as follows:

27     1. finding, among other things, that notice of this
28 Motion was appropriate under the circumstances and complied with

1   all applicable provisions of the Bankruptcy Code, the Bankruptcy

2   Rules, and the Local Bankruptcy Rules;

3      2.  granting this Motion on an interim basis pending a

4   final hearing;

5      3.  authorizing the Debtor, subject to the terms of the

6   Interim Order, to use cash collateral to pay all of the expenses

7   set forth in the Budget on an interim basis pending a final

8   hearing and as otherwise set forth below;

9      4.  providing the Lender with a replacement lien and

10   adequate protection payments as set forth in the Interim Order;

11      5.  setting a final hearing on this Motion; and

12      6.  granting such other and further relief as the Court

13   deems just and proper.

14

   Dated: November 5, 2010     KRYSTAL AIR, LLC

15

16
                        By: _/s/ Ron Bender_____

17                            RON BENDER
                           IRVING M. GROSS

18                            GWENDOLEN D. LONG
                           LEVENE, NEALE, BENDER, YOO

19                            & BRILL L.L.P.
                           Proposed Attorneys for

20                            Chapter 11 Debtor and Debtor
                           in Possession

21

22

23

24

25

26

27

28

25

1

## DECLARATION OF EDWARD P. GRECH

2

I, EDWARD P. GRECH, HEREBY DECLARE AS FOLLOWS:

3       1.    I have personal knowledge of the facts set forth below
4   and, if called to testify, would and could competently testify
5   thereto.

6       2.    I am the founder and person in control of Krystal Air,
7   LLC, a California limited liability company, the debtor and
8   debtor-in-possession    in    the    above-captioned    Chapter    11
9   proceedings (the "Debtor"), and am responsible for overseeing
10  the day-to-day financial operations and financial performance of
11  the Debtor.    Consequently, I am involved in supervising all
12  material aspects of the Debtor's financial affairs.

13      3.    I make this Declaration in support of the Motion to
14  which this Declaration is attached.    Unless otherwise stated,
15  all capitalized terms herein have the same meanings as in the
16  Motion.

17      4.    The Debtor commenced its bankruptcy case by filing a
18  voluntary petition under Chapter 11 of the Bankruptcy Code on
19  November 3, 2010 (the "Petition Date").    The Debtor continues to
20  operate its business, manage its financial affairs and operate
21  its bankruptcy estate as a debtor in possession.

22      5.    The Debtor is a California limited liability company
23  founded in 1998 and headquartered in Brea, California.    The
24  Debtor provides luxury charter jet services to corporate
25  executives, entertainment personalities and other travelers
26  seeking first-class private transportation.    The Debtor owns and
27  operates a Gulfstream G-IV, Registration No. N914EG (the

28

26

1  "Aircraft"), capable of transporting up to thirteen passengers
2  and offers top of the line amenities and conference space.

3      6.    The home airport of the Aircraft is the Van Nuys
4  Airport, located in Los Angeles, County.  In order to provide
5  consistent service and avoid the excessive cost of contract
6  pilots, the Debtor employs a chief pilot and co-pilot on a
7  salaried basis.

8      7.    The Debtor is presently operating under a charter
9  lease agreement with Western Air Charter, Inc. ("Western Air"),
10  whereby the Aircraft operates under Western Air's operating
11  certificate in exchange for Western Air arranging chartered
12  flights of the Aircraft.  However, the Debtor has negotiated a
13  one-year lease agreement (the "Lease Agreement") with Pegasus
14  Elite Aviation, Inc. ("PEA") that will become effective December
15  1, 2010.  The Lease Agreement provides for a contract rate of
16  $3,000 per flight hour and PEA has guaranteed a minimum of fifty
17  hours of charter revenue per month.  In the event PEA fails to
18  meet this guaranteed minimum, PEA will pay the Debtor $2,000 for
19  each and every hour short of the guaranty.  Based on this
20  guaranteed contract minimum and the Debtor's historic monthly
21  charter revenue, the Debtor anticipates a monthly gross cash
22  flow of at least $150,000 and up to $240,000.

23      8.    In March, 2007, the Debtor purchased the Aircraft with
24  financing provided by General Electric Capital Corporation
25  (together with General Electric Capital Solutions and VFS
26  Financing, Inc., collectively, "Lender").  In connection with
27  such financing, the Debtor executed a promissory note in the
28  face amount of $14,300,000 (the "Note") and an Aircraft Security

1  Agreement granting the Lender a security interest in the
2  Aircraft. The Note requires the Debtor to pay, on a quarterly
3  basis, all accrued and outstanding interest plus $100,000 in
4  principal reduction through maturity on September 1, 2017. Upon
5  maturity the Note requires Debtor to pay a balloon payment of
6  $10.4 million, plus all then outstanding and unpaid principal,
7  accrued interest and other miscellaneous amounts. Over the past
8  year, the Debtor's quarterly obligations under the loan were
9  approximately $316,000 per payment period.

10      9.    In addition to the Lender, there are other creditors
11  who have recorded various liens against the Aircraft with the
12  Federal Aviation Administration. The Debtor believes that the
13  total amount of the liens recorded against the Property, as of
14  the Petition Date, was approximately $54,945. Even if the
15  foregoing liens are valid and enforceable (which the Debtor does
16  not concede), such liens against the Aircraft do not result in a
17  security interest against the Debtor's cash collateral.

18      10.   In late 2009, I approached the Lender, on the Debtor's
19  behalf, seeking an accommodation and short-term modification of
20  the Note. I initially offered a specific, eight-month plan
21  that, if accepted, would have reduce the Debtor's quarterly
22  interest payments from approximately $216,000 ($72,000 per
23  month) to $120,000 ($40,000) per month and would have suspended
24  two of the $100,000 principal buy-down payments.

25      11.   I sought this accommodation, before the Debtor
26  encountered actual late-payments, defaults or other
27  delinquencies under the Note. Instead, I contacted the Lender
28  and sought to reach an accommodation to avoid any delinquencies.

1   The recession had depressed the air charter market, causing a
2   significant reduction in charter usage and reduction in the
3   Debtor's revenues.

4        12. The accommodation and short-term modification I
5   proposed would have, if accepted, provided the time necessary to
6   complete two objectives that would have allowed the Debtor to
7   survive the recession. The first was the conclusion of
8   negotiations we had previously started with an existing client
9   for a long-term lease of the Aircraft. Alternatively, we sought
10  the time necessary to permit the Debtor's primary affiliate,
11  Krystal Koach, Inc., to complete a successful workout with its
12  secured lender. I was confident that my proposal, a variation
13  of my proposal, or an alternative manner of workout would have
14  provided the revenue and time necessary to reach these goals.
15  The accommodation I sought would have improved the Debtor's
16  overall financial condition and allowed it, by the end of the
17  modification period, to return to the original loan terms.

18       13. Between December 2009 and April 2010, the Debtor and
19  Lender engaged in extensive negotiations that I understood were
20  cooperative, productive and done in good faith to reach a
21  commercially equitable, short-term accommodation. This
22  accommodation, if reached, would have allowed the Debtor to
23  survive the historic recession. Through this process I modified
24  the relief I sought for the Debtor and modified the proposals I
25  offered for such relief. First, I restricted my request to seek
26  only temporary relief from the $100,000 quarterly, principal
27  buy-down. I abandoned my request to reduce the interest payment
28  and to eliminate the principal buy-down. Second, I offered to

29

1 provide the Lender additional security, for the duration of the
2 short-term modification, with a trust deed against certain
3 commercial real property as additional collateral.   Thus, I
4 offered the Lender a short-term, specific and secured relief
5 plan that would have allowed the Debtor to improve its overall
6 financial condition and to return to the original loan terms by
7 the end of the modification period.

8      14. The Lender inspected the real estate I offered as
9 additional security.   Then, the Lender notified the Debtor, by
10 letter in January, 2010, of an alleged default.   The Lender's
11 letter based the Debtor's default on its alleged failure to make
12 its December 1, 2009 quarterly payment. Yet, during our
13 negotiations, the Lender assured us it could and would defer the
14 Debtor's payments on the Note until the modification was
15 finalized. The negotiations continued over the next three months
16 based on the Lender's assurances and based on the Lender's
17 inaction on the alleged default during this time.

18      15. On April 12, 2010, the Lender's counsel sent a letter
19 to the Debtor declaring the Debtor to be in default and
20 purporting to accelerate the Debtor's obligations under the Note
21 (the "Demand Letter").   Immediately upon receipt of the Demand
22 Letter, I directed my staff to contacted Lender to resolve this
23 apparent misunderstanding. On April 19, 2010, the parties
24 conferred and the Debtor agreed to bring the entire account
25 current.   Based on these specific discussions, not to mention
26 the prior six months I had spent negotiating this relief, I
27 understood quite clearly that the Lender intended to completely
28 waive all defaults when the Debtor brought the account current.

16.   We understood the Lender was agreeable our April 19th proposal, but the Lender did not thereafter respond, except to continue the negotiations for a modification.   We exchanged another round of written proposals in mid-May, 2010.

17.   By June, 2010, however, the tone of the negotiations changed significantly and Lender became intransigent. Now, the Lender refused to reinstate the Note and insisting on modification terms that were so unreasonable that failure and the Debtor's loss of its business were practically built-in.

18.   Based on our April 19 discussions, to show the Debtor's good faith and to re-start meaningful negotiations, the Debtor delivered to the Lender a make-whole check in the amount needed to bring the account current - including late charges - in the amount of $947,400.31. The Lender, however, still refused to honor the terms of the Note.

19.   On July 9, 2010, the Debtor retained LNBYB in a further effort to attempt to negotiate a resolution of the dispute with the Lender.   Those efforts too were ultimately unsuccessful.

20.   As a result of the foregoing, the Debtor was forced to seek protection under Chapter 11 of the Bankruptcy Code in order to continue operating the Aircraft in an effective and cost-efficient manner, to preserve and maximize the value of the Aircraft for the benefit of all creditors, and to confirm a plan of reorganization and successfully emerge from bankruptcy.

21.   The Debtor has the need to use the revenue generated from the Aircraft to maintain the Aircraft and pay operating expenses relating to the Aircraft, including, among other

1   things, insurance, utilities, payroll, maintenance and other
2   operational costs associated with the Aircraft. Without the
3   ability to use cash collateral to pay the ongoing operating
4   expenses of the Aircraft, the Debtor will not be able to
5   continue maintaining the Aircraft. This, in turn, would require
6   the Debtor to discontinue its normal operations, which would
7   decimate the going concern value of the Debtor's business and
8   damage its contractual relationship with PEA.

9       22. The Debtor's proposed post-petition operating budget
10   (the "Budget"), a copy of which is attached hereto as Exhibit
11   "1", contains the expenses I believe must be paid in order for
12   the Debtor to continue to operate and preserve the value of its
13   business pending a successful reorganization. The Budget is
14   prepared on a weekly basis. The expenses contained in the first
15   few weeks of the Budget are those expenses I believe must be
16   paid to enable the Debtor to avoid immediate and irreparable
17   harm to the Debtor's business and bankruptcy estates. The
18   revenues projected in the Budget are the revenues the Debtor
19   projects receiving if business proceeds as planned.

20       23. In addition to the expenses set forth in the Budget,
21   the Debtor is also seeking Court authority to use cash
22   collateral to pay for the following: (a) all quarterly fees
23   owing to the Office of the United States Trustee and all
24   expenses owing to the Clerk of the Bankruptcy Court; and (b) all
25   actual third-party, outside expenses incurred by the Debtor (or
26   its counsel) directly related to the administration of the
27   Debtor's bankruptcy estate (for items such as photocopying,
28   postage, searches, etc.), not to exceed the total sum of $10,000

1  per month.    In addition, the Debtor seeks Court authority to
2  deviate from the line items contained in the Budget by not more
3  than 15% on a line item basis and not more than 10% on an
4  aggregate basis.   Moreover, if any actual expenditures for any
5  line items during a particular period are less than in the
6  Budget, the Debtor seeks Court authority to have the difference
7  carryover to the following period covered by the Budget.   The
8  Debtor also seeks Court authority to pay any other expenses
9  related to the operation of the Debtor's business which are not
10 contained in the Budget without the need for any further order
11 of the Court provided the Lender consents to those payments in
12 advance and in writing. A proposed form of the order granting
13 the Motion is attached as Exhibit "2" hereto.

14       24.   The Debtor proposes to pay to the Lender ongoing post-
15 petition interest payments in the amount of approximately
16 $72,000 per month.   I also think that continued operation of the
17 Debtor's business will maintain the going concern value of the
18 Debtor's business.   Moreover, I do not believe that the Aircraft
19 is currently declining in value and certainly not by any
20 appreciable amount during a short Chapter 11 bankruptcy case.

21       25.   The only source of revenue available to the Debtor to
22 use to operate, maintain, and preserve its business is the
23 revenue generated from the operation of the Aircraft.   Without
24 the use of cash collateral, the Debtor would not be able to
25 continue operating its charter business and would be forced to
26 shut down, which would result in the loss of the jobs of the

27
28

33

1   Debtor's employees and the complete decimation of the going

2   concern value of the Debtor's business.

3       26.  From   numerous   discussions  we  have  had  with

4   representatives of Lender, both the Debtor and Lender agree that

5   the current fair market value of the Aircraft is less than the

6   outstanding indebtedness owing by the Debtor to Lender under the

7

8   Note.

9       27.  I do not believe that any of the other creditors

10  purporting to hold a security interest in the Aircraft has an

11  interest in the Debtor's cash collateral.

12      I declare and verify under penalty of perjury that the

13  foregoing is true and correct to the best of my knowledge,

14  information and belief.

15

16      Executed on this 2nd day of November, 2010, at Brea,

17  California.

18

19                                  EDWARD B. GRECH, Declarant

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"



## KRYSTAL AIR, LLC WEEKLY BUDGET FOR REMAINDER OF 2010

| Week Of: | Date: | Description: | Receivables: | Payables: | Balance: |
|---|---|---|---|---|---|
| | 3-Nov-2010 | Balance Forward | | | $ 8,342.00 |
| 1-Nov-2010 | | | | | $ 8,342.00 |
| | 12-Nov-2010 | Payroll | | $ (7,200.00) | |
| 8-Nov-2010 | | | | | $ 1,142.00 |
| 15-Nov-2010 | | | | | $ 1,142.00 |
| | 22-Nov-2010 | October Check from Jet Edge | $ 120,000.00 | | |
| | 22-Nov-2010 | Jet Edge Reimbursements | | $ (10,000.00) | |
| | 26-Nov-2010 | Payroll | | $ (14,000.00) | |
| | 26-Nov-2010 | Maintenance (JSSI) | | $ (27,500.00) | |
| 22-Nov-2010 | | | | | $ 69,642.00 |
| | 29-Nov-2010 | Payroll | | $ (1,350.00) | |
| | 29-Nov-2010 | Telephones | | $ (1,300.00) | |
| | 29-Nov-2010 | Work Comp Insurance | | $ (437.43) | |
| 29-Nov-2010 | | . | | | $ 66,554.57 |
| | 10-Dec-2010 | Payroll | | $ (7,200.00) | |
| 6-Dec-2010 | | | | | $ 59,354.57 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **13-Dec-2010** | | | | | | **$   59,354.57** |
| | 20-Dec-2010 | November Check from Jet Edge | $ | 150,000.00 | | |
| | 20-Dec-2010 | Jet Edge Reimbursements | | | $ (10,000.00) | |
| | 24-Dec-2010 | Maintenance (JSSI) | | | $ (27,500.00) | |
| | 24-Dec-2010 | Payroll | | | $ (14,000.00) | |
| **20-Dec-2010** | | | | | | **$ 157,854.57** |
| | 27-Dec-2010 | Payroll | | | $ (1,350.00) | |
| | 27-Dec-2010 | Telephones | | | $ (1,300.00) | |
| | 27-Dec-2010 | Work Comp Insurance | | | $ (437.43) | |
| **27-Dec-2010** | | | | | | **$ 154,767.14** |
| | 7-Jan-2011 | Payroll | | | $ (7,200.00) | |
| **3-Jan-2011** | | | | | | **$ 147,567.14** |

**EXHIBIT "2"**

1  RON BENDER (SBN 143364)
   IRVING M. GROSS (SBN 53659)
2  GWENDOLEN D. LONG (CA admission pending)
   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
   Telephone:  (310) 229-1234
5  Facsimile:  (310) 229-1244
   Email:  rb@lnbyb.com, img@lnbyb.com, gdl@lnbyb.com
6
7  Proposed Attorneys for Chapter 11 Debtor
   And Debtor in Possession
8
9              **UNITED STATES BANKRUPTCY COURT**
10              **CENTRAL DISTRICT OF CALIFORNIA**
11              **(SAN FERNANDO VALLEY DIVISION)**
12
   In re:                          ) Case No.
13                                  )
   KRYSTAL AIR, LLC,               ) Chapter 11
14                                  )
                   Debtor.          ) **ORDER   GRANTING   DEBTOR'S**
15                                  ) **EMERGENCY MOTION FOR ENTRY OF**
                                    ) **AN   ORDER   AUTHORIZING   DEBTOR**
16                                  ) **TO USE CASH COLLATERAL ON AN**
                                    ) **INTERIM BASIS PENDING A FINAL**
17                                  ) **HEARING**
18                                  )
                                    )
19                                  )

20      A hearing was held on November 10, 2010, at 11:00 a.m.,
21  before the Honorable Maureen Tighe, United States Bankruptcy
22  Judge for the Central District of California, in Courtroom 303
23  located at 21041 Burbank Blvd., Woodland Hill, California to
24  consider the emergency motion (the "Motion") filed by Krystal
25  Air, LLC (the "Debtor"), the Chapter 11 debtor and debtor in
26  possession in the above-captioned case, for the entry of an
27  order, pursuant to 11 U.S.C. § 363(c), authorizing the Debtor to
28

                            35

1  use cash collateral on an emergency interim basis pending a

2  final hearing in accordance with the Debtor's operating budget

3  (the "Budget"), a copy of which is attached as Exhibit "1" to

4  the Declaration of Edward P. Grech filed concurrently with the

5  Motion (the "Grech Declaration"). Appearances at the hearing on

6  the Motion were made as set forth on the record of the Court.

7       The Court, having considered the Motion, all papers filed

8  by the Debtor in support of the Motion, and the oral arguments

9  and statements of counsel made at the hearing on the Motion,

10  proper notice of the Motion and the hearing on the Motion having

11  been provided, and good cause appearing therefor,

12      IT IS HEREBY ORDERED AS FOLLOWS:

13      A.   The Motion is granted in its entirety.

14      B.   The Debtor is authorized to use cash collateral to (a)

15  pay all of the expenses set forth in the Budget, with authority

16  to deviate from the line items contained in the Budget by not

17  more than 15% on a line item basis and not more than 10% on an

18  aggregate basis, with any unused portions to be carried over

19  into the following week(s) (ii) all quarterly fees owing to the

20  Office of the United States Trustee and all expenses owing to

21  the Clerk of the Bankruptcy Court; (iii) all actual third-party,

22  outside expenses incurred by the Debtor (or its counsel)

23  directly related to the administration of the Debtor's

24  bankruptcy estate (for items such as photocopying, postage,

25  searches, etc.), not to exceed the total sum of $10,000 per

26  month; and (iv) any expenses expressly consented to by the

27  Debtor's secured lender.

28

36

1    C.   A  further  hearing  regarding  the  Motion  and  the
2  Debtor's continued authority to use cash collateral will be held
3  on _____, 2010 at _____ __.m.

4    D.   The Debtor shall file with the Court any papers to
5  support the Debtor's continued authority to use cash collateral
6  (the "Supplemental Pleadings") by _____, 2010.   The
7  Debtor  shall  provide  courtesy  copies  of  the  Supplemental
8  Pleadings to chambers, and serve the Supplemental Pleadings on
9  all known secured creditors (and their counsel, if known), the
10  Office of the United States Trustee ("OUST"), any official
11  committee appointed in the Debtor's case or, in the event no
12  committee  has  been  appointed,  the  Debtor's  twenty  largest
13  unsecured creditors, so that the Supplemental Pleadings are
14  received by all such parties by _____, 2010.

15    E.   Any response to the Supplemental Pleadings must be
16  filed with the Court by _____, 2010. A courtesy copy
17  of the response must be provided to chambers, and served on the
18  Debtor, counsel for the Debtor, all known secured creditors (and
19  their counsel, if known), the OUST, any official committee
20  appointed in the Debtor's case or, in the event no committee has
21  been appointed, the Debtor's twenty largest unsecured creditors,
22  so that such response is received by all such parties by
23  _____, 2010.

24    F.   The Debtor's reply to any response to the Supplemental
25  Pleadings must be filed with the Court by _____ _____,
26  2010. A courtesy copy of the Debtor's reply must be provided to
27  chambers, and served on all known secured creditors (and their
28  counsel, if known), the OUST, any official committee appointed

37

1  in the Debtor's cases or, in the event no committee has been

2  appointed, the Debtor's twenty largest unsecured creditors, so

3  that such response is received by all such parties by

4  _____, 2010.

5

6  IT IS SO ORDERED.

7                                    ###

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| In re: | | | **CHAPTER 11** |
|---|---|---|---|
| | **KRYSTAL AIR, LLC,** | | |
| | | Debtor(s). | CASE NO 1:10-bk-23983-GM |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF EDWARD P. GRECH IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 5, 2010**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Leo D Plotkin    lplotkin@lsl-la.com, dsmall@lsl-la.com

**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served): On **November 5, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **November 5, 2010**  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.    Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

**Served by Personal Delivery via Attorney Service**

| | |
|---|---|
| Hon. Geraldine Mund | Hon. Maureen A. Tighe |
| United States Bankruptcy Court | United States Bankruptcy Court |
| Courtroom 303 | Courtroom 302 |
| 21041 Burbank Boulevard | 21041 Burbank Boulevard |
| Woodland Hills, CA 91367 | Woodland Hills, CA 91367 |

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

| November 5, 2010 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1

## II. TO BE SERVED BY OVERNIGHT MAIL:

Krystal Air, LLC
2701 E. Imperial Highway
Brea, CA 92821

U.S. Trustee
21051 Warner Center Lane
Suite 115
Woodland Hills, CA 91367

Levy, Small & Lallas
*Counsel to GE Capital*
815 Moraga Drive
Los Angeles, CA 90049
Attn: Leo D. Plotkin, Esq.

GE Capital
PO Box 64387
Pittsburgh, PA 15264-3897

Western Jet Aviation
16101 Saticoy Street,
901 Hangar
Van Nuys, CA 91406

Verizon Wireless
15505 Sand Canyon Ave
Irvine, CA 92618

Universal Weather & Aviation,
Inc.
8787 Tallyho
Houston, TX 77061

T-Mobile
12920 SE 38th St
Bellevue, WA 98006

Solomon, Winnett & Rosenfield
11777 San Vicente Blvd., #777
Los Angeles, CA 90049

Sentinent Flight Group, LLC
295 McLaws Circle, Suite One
Williamsburg, VA 23185

McDermott, Will & Emery
2049 Century Park East
Los Angeles, CA

Lovitt & Touche
7202 E. Rosewood, #200
Tucson, AZ 85710

L.A. County Tax Collector
225 N. Hill Street, #122
Los Angeles, CA 90012

JSS1
180 N. Stetson, Suite 29
Chicago, IL 60601

Jet Edge
16135 Cohasset Street
Van Nuys, CA 91406

Jeppeson
55 Inverness Drive East
Englewood, CO 80112

Honeywell
21111 N. 19th Avenue
Phoenix, AZ 85027

Gulfstream
500 Gulfstream Road
Savannah, GA 31407

Fred Muller, Esq.
15915 Ventura Blvd. #203
Encino, CA 91436

Frandzel, Robins, Bloom &
Csato
6500 Wilshire Blvd # 1700
Los Angeles, CA 90048

Epic Aviation, LLC
295 McLaws Circle, Suite One
Williamsburg, VA 23185

Edward Grech
2701 E. Imperial Highway
Brea, CA 92821

Corporate Air Parts, Inc.
7641 Densmore Avenue
Van Nuys, CA 91406

Banyan Air Services, Inc.
5360 NW 20th Terrace
Ft. Lauderdale, FL 33309

B of A Business Card
P.O. Box 15184
Wilmington, DE 19850

Aircell Bus. Aviation Services,
LLC
Department 1371
Denver, CO 80256

Aerlex Law Group
2800 28th St # 200
Santa Monica, CA 90405

1  **III.  TO BE SERVED BY FACSIMILE OR EMAIL:**

2  Krystal Air, LLC
   cdumas@krystalair.cc

3
   JSSI
   customersvc@jetsupport.com

4  U.S. Trustee
   ustpregion16.wh.ecf@usdoj.gov

   Jet Edge
   charter@thejetedge.com

5  GE Capital
   lplotkin@lsl-la.com
6  dsmall@lsl-la.com
   Jeppeson
   captain@jeppeson.com

7  Western Jet Aviation
   sales@wja.aero
   Honeywell
8  Fax: (602) 365-3343

   Verizon Wireless
9  Fax: (309) 831-1011
   Gulfstream
   Denise.Schaffer@gulfstream.com

10 Universal Weather & Aviation, Inc.
   creditgroup@univ-wea.com
   Edward Grech
11 egrech@krystal.cc

   T-Mobile
12 Fax: (813) 353-6599
   Corporate Air Parts, Inc.
   nlooy@corpairparts.com

13 Solomon, Winnett & Rosenfield
   info@swrcpa.net
   Banyan Air Services, Inc.
14 Fax:  (954) 771-0281

   Sentinent Flight Group, LLC
15 accounting@sentient.com
   B of A Business Card
   abuse@bankofamerica.com

16 McDermott, Will & Emery
   contactus@mwe.com
   Aircell Bus. Aviation Services, LLC
17 sales@aircell.com

   Lovitt & Touche
18 info@lovitt-touche.com
   Aerlex Law Group
   info@aerlex.com

19 L.A. County Tax Collector
   info@lacounty.gov

20

21

22

23

24

25

26

27

28